IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Margaret M. Morse,<br>                      Plaintiff,<br>    vs.<br>Michael J. Astrue,<br>Commissioner of Social Security,<br>                      Defendant. | Civil Action No. 6:08-1365-RBH-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits (DIB) on March 8, 2005, alleging that she became unable to work on October 15, 1999. The application was denied initially and on reconsideration by the Social Security Administration. On August 19, 2005, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, her attorney and a vocational expert appeared on January 18, 2006,

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

considered the case *de novo*, and on May 29, 2007, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on February 28, 2008. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)     The claimant meets the insured status requirements of the Social Security Act through March 31, 2002.
>
> (2)     The claimant has not engaged in substantial gainful activity since October 15, 1999, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq*.)
>
> (3)     The claimant has the following severe impairments: polymyalgia rheumatica, temporal arteritis, coronary artery disease (CAD), carotid vascular disease (CVB) and bronchitis (20 CFR 404.1520(c)).
>
> (4)     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 303, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> (5)     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently, stand 2 hours in an 8 hour workday, walk 2 hours in an 8 hour workday and sit 6 hours in an 8 hour workday. The claimant is able to occasionally push/pull with her lower extremities. The claimant is able to climb stairs and ramps occasionally but should never climb ropes, ladders or scaffolds. She is able to frequently stoop and occasionally kneel, crouch, crawl and reach overhead. The claimant is able to frequently handle with the left upper extremity. She should avoid concentrated exposure to fumes.
>
> (6)     The claimant is unable to perform any past relevant work (20 CFR 404.1565).
>
> (7)     The claimant was born on November 21, 1043 and was 55 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563).

>(8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).
>
>(9) The claimant has acquired work skills from past relevant work (20 CFR 404.1568).
>
>(10) Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1560(c), 404.1566 and 404.1568(d)).
>
>(11) The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 1999 through the date of this decision (20 CFR 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

>the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals

an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff, who was born in November 1943, was 55 years old at the time she allegedly became disabled and 58 years old on her date last insured (Tr. 330). She earned a high school diploma and, after two years of nursing school, received certification as a licensed practical nurse (Tr. 351). The plaintiff alleges she became disabled on October 15, 1999, due to heart disease, high blood pressure, and bronchitis (Tr. 40). The plaintiff must establish disability prior to her date last insured, March 31, 2002.

### A.   Medical Evidence

The record reveals that the plaintiff has a long history of coronary artery disease and cardiovascular disease. She underwent cardiac-related operations in 1999 and 2000, recovered well from both, and had reduced symptoms and complaints following these surgeries. Other than limiting her lifting post-surgery, no physician has placed limitations on the plaintiff's activities. Furthermore, her treating physicians approved her frequent international travel to Romania, a country with less advanced medical care, during the alleged period of disability.

5

On March 27, 1997, the plaintiff was evaluated by Dr. Ariane Lieberman for a heart murmur and high blood pressure. Dr. Lieberman recorded that the plaintiff was a missionary in Romania approximately six months out of the year. On the day of the examination, the plaintiff was in no acute distress and had a blood pressure reading of 150/75. An EKG showed a marked sinus bradycardia and evidence of left atrial enlargement. A two-D echocardiogram showed normal left ventricular systolic function, normal diastolic function, regurgitation of the mitral and tricuspid valves, aortic valve thickened without restriction, mild aortic root thickening, and elevated pulmonary artery systolic pressure (Tr. 101-02, 209).

A prescription written by Dr. Williams at Primary Medical Associates dated March 29, 1998, indicated that the plaintiff needed a refill of potassium as soon as possible because she was returning to Romania. A similar prescription was written in September 1998 because the plaintiff was leaving for Romania. Likewise, Dr. Williams refilled the potassium in March 1999 because the plaintiff's sister-in-law could deliver it to Romania for the plaintiff (Tr. 136-37).

On October 16, 1999, the plaintiff was admitted to the Medical University of South Carolina for evaluation and treatment of unstable angina. She was diagnosed with multi-vessel coronary artery disease. Dr. James Zellner performed an artery bypass grafting surgery on the plaintiff on October 18, 1999. She tolerated the procedure well, without complications. The plaintiff recovered extremely well and was released from the hospital on October 22nd, four days after surgery (Tr. 103-10). On November 2, 1999, Dr. Zellner reported that other than episodic atrial fibrillation, which is normal following coronary bypass surgery, the plaintiff was recovering well (Tr. 107-08).

Physician notes from Primary Medical Associates indicate the plaintiff presented with cold-like symptoms on multiple occasions in 1999 (Tr. 133-35). The plaintiff was evaluated by Dr. Williams at Primary Medical Associates on March 8, 2000, complaining

6

of tiredness, not sleeping well, headaches, and general upset. The physician recorded that the plaintiff had traveled from Romania four days prior (Tr. 129). On October 9, 2001, the plaintiff was evaluated by Dr. Williams for cough and congestion symptoms (Tr. 127).

On November 10, 2001, the plaintiff was admitted to Providence Hospital for percutaneous revascularization. Dr. Daniel Bouknight placed a stent in the plaintiff's left internal carotid artery. The procedure successfully reduced stenosis in the plaintiff's left internal carotid artery to 5% residual; prior to surgery, the stenosis was at 80-85%. On the morning of discharge, the next day, the plaintiff had no complaints. Dr. Bouknight's discharge notes indicated that the plaintiff should avoid lifting (Tr. 111-17).

### *Dr. Larry Kelly*

The plaintiff visited Dr. Larry Kelly for treatment on three occasions prior to her date last insured. She first visited Dr. Kelly on November 30, 2000, to establish care and for treatment of nasal drip and nasal sores. His notes from that visit indicated that the plaintiff worked permanently as a missionary in Romania (Tr. 256-57). On December 6, 2000, Dr. Kelly treated the plaintiff for a nasal pustule. He noted that the plaintiff had an "episode in October while in Romania" of an abscess on her nasal cavity (Tr. 254). Dr. Kelly evaluated the plaintiff on January 25, 2002, for polymyalgia (Tr. 251).

Dr. Kelly continued to treat the plaintiff for various complaints after her date last insured. On May 9, 2002, Dr. Kelly evaluated her for "flutters" in her chest. Dr. Kelly diagnosed symptomatic premature ventricular contraction. Dr. Kelly did not think the plaintiff was experiencing serious arrhythmia and prescribed Metoprolol to suppress the premature ventricular contractions. Dr. Kelly's notes indicated that the plaintiff was leaving for Romania the following week and they should have time to assess the symptoms prior to then (Tr. 249).

On October 19, 2005, during a visit with Dr. Kelly, the plaintiff indicated that her condition had improved and she felt well enough to go to Romania. On December 29, 2005,

over three years after the plaintiff's insured status expired, Dr. Kelly wrote a letter "to whom it may concern" opining that the plaintiff was totally disabled (Tr. 227).

The record also contains a medical statement from Dr. Kelly dated January 2006, well after the plaintiff's date last insured of March 31, 2002 (Tr. 224-26). Dr. Kelly diagnosed the plaintiff with polymyalgia rheumatica, temporal arteritis, coronary artery disease, and carotid vascular disease. He indicated that the plaintiff demonstrated the symptoms of severe fatigue and severe malaise. In his opinion, the plaintiff could work zero hours per day, was limited to standing less than 15 minutes at one time and limited to sitting for 60 minutes at a time. Dr. Kelly opined that the plaintiff could lift five pounds on an occasional basis and no amount of weight on a frequent basis. His comments indicated that this opinion, completed in 2006, reflected the plaintiff's medical status from January 25, 2002, through January 2006. Thus, these limitations represent Dr. Kelly's opinions about the plaintiff's conditions over a four-year time period, beginning just two months prior to her date last insured (Tr. 224-26).

*Dr. Benjamin Jones*

Dr. Benjamin Jones began treating the plaintiff in September of 2000. The plaintiff first visited him for a second opinion regarding surgery for her bilateral carotid artery disease. At that time, Dr. Jones opined that reducing her risk factors would be more beneficial than carotid surgery. His notes indicated that the plaintiff was planning on returning to Romania shortly (Tr. 312-14).

The plaintiff followed up with Dr. Jones on November 27, 2000, at which time she indicated she was having periods of chest pain aggravated by emotional stress and tiredness. Dr. Jones indicated that the plaintiff had bilateral carotid disease which he considered to be in the "grey zone" for treatment. However, because she spent so much

time in Romania, away from good medical care, he felt that she should consider inserting a stent in one or both of the arteries (Tr. 310).

Just weeks later, on December 7, 2000, Dr. Feldman at the Columbia Heart Clinic opined that, after reviewing the plaintiff's arteriograms, he did not think her right carotid stenosis of less than 70% was significant enough to warrant therapy. Dr. Feldman presented the plaintiff with two surgical options, an angioplasty and stenting or carotid enarterectomy (Tr. 309).

The plaintiff visited Dr. Jones on December 8, 2000, at which time he recorded that her stress test was negative and she was doing well (Tr. 307).

On January 24, 2001, the plaintiff was evaluated by Dr. Jones following placement of a left carotid stent on January 10, 2001. At this time, the plaintiff had no chest pain or other cardiac symptoms. An electrocardiogram (EKG) indicated a normal sinus rhythm. Dr. Jones noted that the plaintiff was recovering nicely and indicated that it would be okay for her to return to Romania at that time (Tr. 305).

Upon her return from Romania, the plaintiff saw Dr. Jones on June 18, 2001. Her blood pressure was markedly elevated, as high as 190/130. Dr. Jones diagnosed her with diffuse vascular disease (Tr. 303). Shortly thereafter, on June 26, 2001, the plaintiff saw Dr. Jones for a follow-up visit. Dr. Jones noted at that time that the plaintiff was doing well and modified her medications. His notes indicated that the plaintiff was leaving for Romania days later (Tr. 289-99).

The plaintiff presented to Dr. Jones on January 9, 2002 with significant angina. He recorded that the plaintiff's heart sounds were normal and had a regular rhythm. His notes indicated that he had previously prescribed Imdur by phone to treat the angina (Tr. 297). At the next visit, Dr. Jones recorded that the plaintiff was "doing much better over the last six weeks" and was leaving for Romania that day - February 20, 2002 (Tr. 295).

When the plaintiff returned from Romania, she visited Dr. Jones on May 13, 2002, complaining of heart "flutters." A stress test was negative for ischemia and revealed an ejection fraction of 70%. Dr. Jones recorded that, other than the heart flutterings, the plaintiff had been doing well. Dr. Jones' assessment stated "overall stable cardiovascular status with a negative stress Cardiolite today during which she walked 9 min. without chest pain or shortness of breath." He noted that the plaintiff was leaving for Romania that day. The plaintiff's next visit to Dr. Jones was on March 7, 2003, after her insured status expired (Tr. 291-93).

Like Dr. Kelly, Dr. Jones completed a medical statement in January 2006 reflecting the plaintiff's condition from January 10, 2001, to the date of completion - a span of five years. Dr. Jones opined that the plaintiff had anginal pain, positive exercise tolerance test, current blockages shown on catheterization, and weakness and fatigue due to cardiac condition. He concluded that she could work zero hours per day, stand for 15 minutes at a time, and sit for 60 minutes at a time. Dr. Jones indicated that the plaintiff could lift five pounds occasionally, but could not lift any weight on a frequent basis. He opined that the plaintiff "has been completely disabled since January 10, 2001," based on her significant left arm claudication, with pain that limits her ability to do any kind of work. Additionally, Dr. Jones pointed to past uncontrolled hypertension related to renal artery stenosis, as well as palpitations, angina, and dyspnea related to coronary artery disease (Tr. 277-80).

### *Dr. James Weston*

On April 25, 2005, state agency physician Dr. James Weston completed a physical residual functional capacity assessment regarding the plaintiff's work capabilities. Dr. Weston concluded that the plaintiff could lift 50 pounds occasionally and 25 pounds frequently. He opined that she could stand and/or walk for six hours during an eight-hour work day and sit for about six hours during an eight-hour work day (Tr. 216-23).

10

**B.     Hearing Testimony**

At the hearing, the plaintiff testified that she last worked in December 1997 (Tr. 351-52). She stated that for a time after 1997, she made her home permanently in Romania (Tr. 352). In 2000, the plaintiff spent approximately six months of the year in Romania (Tr. 356). She testified that traveling from South Carolina to Romania takes about seven or eight hours of flight time (Tr. 372-73). The plaintiff indicated that she uses a wheelchair for transportation in the Atlanta airport, but walks in the Budapest airport and walks upon arrival in Romania (Tr. 372-73). She testified that her housing in Romania did not have adequate heat until approximately 2004, at which time her church installed heat in her apartment (Tr. 354).

The plaintiff testified that while in Romania, she spends time with high-school aged girls who reside in an orphanage run by the plaintiff and her husband (Tr. 353-54). She testified that she spends time with the girls most weekdays, for approximately three hours, dining, chatting, praying, or watching movies, and occasionally some of the girls will spend the night at the plaintiff's apartment (Tr. 357-58, 360-61).

The plaintiff testified that her pain level in 1999 was a one on a scale of one-to-ten, with ten being the worst (Tr. 371). She indicated that her pain has worsened since then, with it being a seven or eight on the date of the hearing (Tr. 371). The plaintiff indicated that sitting is not difficult for her and that she is capable of walking very short distances (Tr. 365).

The ALJ also received testimony from Arthur Schmitt, Ph.D., a vocational expert (Tr. 381-86). Dr. Schmitt described the plaintiff's past relevant work as a licensed practical nurse (LPN) and identified transferable skills that she possessed from her prior work (Tr. 382-83). The ALJ asked Dr. Schmitt to assume a hypothetical person of the plaintiff's age, education level, and work experience who could lift 10 pounds frequently and 20 pounds occasionally; could stand for two out of eight hours; could walk for two out of eight hours; and could sit for six out of eight hours (Tr. 383). Dr. Schmitt testified that such a person could not

perform the plaintiff's past relevant work (Tr. 383). Dr. Schmitt further testified that this hypothetical person could perform other jobs existing in the national economy using transferable skills with very little, if any, vocational adjustment (Tr. 383-84). Specifically, Dr. Schmitt identified the jobs of medical records clerk[2] and medical assistant[3] as jobs the individual could perform using transferable skills from her past work as an LPN; specifically, those transferable skills included knowledge of medical records, taking vital signs, and assisting doctors (Tr. 384-85).

**C. Appeals Council**

In a vocational report submitted by the plaintiff to the Appeals Council, vocational expert Dr. Dixon Pearsall stated his opinion that the ALJ's decision that the plaintiff had transferable skills to the positions of hospital admitting clerk and medical assistant was based on incorrect vocational information and testimony. Dr. Pearsall noted that one of the positions, medical assistant, is not referenced in the DOT, and the other position, hospital admitting clerk, was incorrectly classified as "medical records clerk" by Dr. Schmitt at the hearing. Dr. Pearsall stated that there are few, if any, transferable skills from the position of licensed practical nurse to the position of hospital admitting clerk. Dr. Pearsall opined:

> Certainly there are not sufficient transferable skills to transfer to a semi-skilled position with little or no adjustment, training, or retraining which would be the Social Security Administration standard referencing [the plaintiff's] age. The hospital admitting clerk is primarily a semi-skilled position whereas the licensed

---

[2] *U.S. Dep't of Labor, Employment & Training Admin., Dictionary of Occupational Titles* (*DOT*) (4th ed. 1991), # 205.362-018.

[3] *DOT* # 079.362-010. While the vocational expert mistakenly identified the job as having the DOT # 079.367-010, it is clear that DOT 079.362-010 medical assistant was the job intended to be identified. The title matches, as does the description including specific vocational preparation of 6, skilled, light work (Tr. 384).

12

>practical nurse is a skilled direct care medical provider with few if any clerical duties.

(Tr. 316-19).

## ANALYSIS

The plaintiff has a high school education and two years of nursing school. She has past relevant work experience as a licensed practical nurse. The plaintiff alleges that she became disabled on October 15, 1999, due to heart disease, high blood pressure, and bronchitis. The plaintiff was 55 years old on the date she claims she became disabled and 58 years old on the date she was last insured. The plaintiff argues that the ALJ erred by (1) failing to properly consider the opinions of her treating physicians and (2) accepting incorrect vocational expert testimony that conflicts with the *Dictionary of Occupational Titles* ("DOT").

***Treating Physicians***

The plaintiff alleges the ALJ failed to properly consider the opinions of two of her treating physicians, Drs. Kelly and Jones. The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

Dr. Jones, a heart specialist who treated the plaintiff beginning in August 2000, completed a letter and a medical statement in January 2006 (the plaintiff's insured status expired on May 9, 2002) reflecting the plaintiff's condition from January 10, 2001, to the date of completion – a span of five years. Dr. Jones opined that the plaintiff had anginal pain, positive exercise tolerance test, current blockages shown on catheterization, and weakness and fatigue due to cardiac condition. He concluded that she could work zero hours per day, stand for 15 minutes at a time, and sit for 60 minutes at a time. Dr. Jones indicated that the plaintiff could lift five pounds occasionally but could not lift any weight on a frequent basis.

He opined that the plaintiff "has been completely disabled since January 10, 2001," based on her significant left arm claudication, with pain that limits her ability to do any kind of work. Additionally, Dr. Jones pointed to past uncontrolled hypertension related to renal artery stenosis, as well as palpitations, angina, and dyspnea related to coronary artery disease. Dr. Jones stated, "She is very limited in her ability to do physical exercise and knowing Peggy as I do, I am sure that she would prefer to be very vigorous and active but that is simply not possible" (Tr. 277-80).

> The ALJ found as follows with regard to Dr. Jones' opinion:
>
> [Dr. Jones] provided a medical source statement suggesting the claimant has been unable to work since January 2001 with, among other things, the retained ability to sit, stand and walk for only a few minutes at a time, lift up to five pounds occasionally (nothing frequently) and perform occasional postural activities. Dr. Jones' conclusions are not supported by the record as a whole, and by his own treating notes in particular.  Moreover, they are contradicted by the claimant's own acknowledged activities. . . . In addition to the inconsistencies noted above, Dr. Jones' opinion does not appear to be supported by his own testing of the claimant's residual functional capacity, and portions of it cannot even be considered "medical" opinions, including his ultimate conclusion the claimant is unable to work at all.  As a result, Dr. Jones' opinion is not entitled to controlling weight. . . . Full strength and full range of motion were noted.  There were no objective findings, the claimant's gait was normal, and she was found to be neurologically intact. Activities include the substantial amount of volunteer work noted above.  Because of the lack of an identifiable basis up on which Dr. Jones' opinion is rendered, it is given no weight as to both the medical and nonmedical portions.

(Tr. 23) (citations omitted).

The ALJ briefly mentions several notes stating that the plaintiff was "stable" or improved," but no context is provided.  There is no reference to the findings in Dr. Jones' medical notes that the plaintiff had periodic class III angina pectoris "limiting her ability to exert herself in any significant way" (Tr. 287, 289, 291, 293, 295, 297).  In fact, in January 2002, several months prior to the date the plaintiff was last insured, Dr. Jones stated his

15

impression in his office notes: "The patient does have significant angina. I really do think she is limited both by that and by her carotid disease. I suggested she even consider applying for disability and she will be considering this" (Tr. 297). As pointed out by the plaintiff, there is almost no real analysis by the ALJ of her medical conditions and the evidence indicating the severity of those conditions (Tr. 21). The plaintiff argues that there are many references during the relevant period to the weakness, shortness of breath, and pain from which she suffered. She notes that her condition waxed and waned, and at times she did report she was feeling better and not experiencing pain as severe as in the past. As argued by the plaintiff, the ALJ in this case provided only a partial, limited picture of the medical evidence. Notably, Dr. Jones is a specialist who had a long history of treating the plaintiff. Upon remand, the ALJ should be instructed to consider all of the evidence, included the findings and evidence cited by Dr. Jones as providing the basis for his opinion (Tr. 277, 279) and the factors discussed above in deciding the weight to give Dr. Jones' opinion.

In a letter dated December 29, 2005, Dr. Kelly, an internist who treated the plaintiff since November 2000, opined the plaintiff is "totally disabled from any kind of work." He noted her need for high doses of steroids due to her polymyalgia rheumatica. He stated her condition has existed since January 2002, and "it has rendered her unable to work in any capacity." He agreed with Dr. Jones in the fact that her complete disability "was probably earlier than that related to her heart and vascular disease, most notably the left arm claudication from her peripheral arterial disease in that extremity" (Tr. 227). In January 2006, Dr. Kelly completed a Medical Statement Regarding Inflammatory Arthritis, in which he diagnosed the plaintiff with polymyalgia rheumatica, temporal arteritis, coronary artery disease, and carotid vascular disease. He indicated that the plaintiff demonstrated the symptoms of severe fatigue and severe malaise. In his opinion, the plaintiff could work zero hours per day, was limited to standing less than 15 minutes at one time and limited to sitting for 60 minutes at a time. Dr. Kelly opined that the plaintiff could lift five pounds on an

occasional basis and no amount of weight on a frequent basis. His comments indicated that this opinion reflected the plaintiff's medical status from January 25, 2002, through January 2006 (Tr. 224-27).

> The ALJ found as follows with regard to Dr. Kelly's statement:
>
> For the same reasons [given as to Dr. Jones' opinion] both the medical and nonmedical portions of Dr. Kelly's opinion are given no weight (i.e., inconsistencies with the record as a whole, his own treatment notes, other medical evidence and the claimant's own admitted activities during that time). In particular, Dr. Kelly's conclusions are inconsistent with the claimant's work as a missionary, with her constant international travel back and forth from Romania, and living in a cold environment with almost no heat in Romania. Dr. Kelly's treatment notes of January 25, 2002, indicate 5/5 strength and normal gait. Her next appointment with Dr. Kelly occurred in May 2002 after she came back from Romania and with a return trip to Romania scheduled for the following week. The May 2002 examination showed "no serious cardiac situation." The claimant's date last insured expired between these two physician's visits, and during this period the claimant maintained her schedule of travel and missionary work.

(Tr. 23-24) (citation omitted).

It appears that the plaintiff traveled to Romania eight times during the period at issue (def. brief 16-17). The plaintiff testified at the hearing that her total time spent there each year has diminished (Tr. 356). As argued by the plaintiff, the fact that she can occasionally travel does not equal a finding that she is not disabled under the Social Security rules. The plaintiff testified in the hearing as to her activities in Romania (Tr. 356–58, 360-61), which consisted of spending approximately three hours a day for four or five days a week with the girls in the group home. As the plaintiff notes, there is nothing contradictory between her description of her activities and the limitations as set forth by Drs. Jones and Kelly. The plaintiff argues that the ALJ pulled one or two statements out of the extensive medical record and failed to consider the findings and evidence supporting Dr. Kelly's opinion, including Dr. Kelly's reference to the plaintiff's on and off need for "high

17

dose steroids for remediation of severe muscle pains related to [her] rheumatologic disorder" (Tr. 297).  As with Dr. Jones' opinion, upon remand, the ALJ should be instructed to consider all of the evidence, included the findings and evidence cited by Dr. Kelly as providing the basis for his opinion and the factors discussed above in deciding the weight to give Dr. Kelly's opinion.

### *Vocational Expert Testimony*

The plaintiff also argues that the ALJ erred by accepting incorrect vocational expert testimony that conflicts with the DOT.

> Social Security Ruling 00-4p provides in pertinent part:
>
> When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, *3.

The ALJ limited the plaintiff to a restricted range of sedentary to light work (sedentary standing and walking restrictions, light lifting restrictions) (Tr. 19). Notably, given the ALJ's findings, the plaintiff is automatically disabled under the Social Security regulations unless there are transferable skills to occupations she can still perform within her functional capacity (*see* Tr. 24; 20 C.F.R. Pt. 404, Subpt. P, App. 2).  In response to the hypothetical question that included the same limitations as found by the ALJ, the vocational expert, Dr. Arthur Schmitt, cited two jobs that he believed could be performed within the parameters of the restrictions indicated and which would allow the plaintiff to transfer skills

18

from previous employment. These jobs were: "medical records clerk" (DOT no. 205.362-018); and "medical assistant" ( DOT no. 079.367-010) (Tr. 384).

In the hearing, the vocational expert initially testified that there would be no light level jobs to which the plaintiff could transfer skills (Tr. 384). The expert then identified the medical assistant position (DOT no. 079.367-010) as a light level job the plaintiff could do (Tr. 384). As noted by the plaintiff, the contradiction is not clarified in the record. The plaintiff next argues that the position "does not appear to actually exist in the [DOT]" (pl. brief 21). This argument is without merit. The DOT number cited by the vocational expert for the position of medical assistant is one digit off of the correct number for the position, which has the same title (medical assistant) and job description as that cited by the vocational expert.[4] Accordingly, this is a harmless error. The plaintiff further notes that the vocational expert failed to explain how the plaintiff could perform this light occupation when the hypothetical restricted her to standing and walking only two hours a day (Tr. 383). Under SSR 00-4p cited above, the ALJ is required to ask the vocational expert about any conflict between his testimony and the DOT. Here, the expert's testimony is contradicted by the definition of light work as provided in the regulations and in the DOT. Upon remand, the ALJ should be instructed to obtain vocational expert testimony explaining the above inconsistencies.

With regard to the "medical records clerk" position, which in the DOT is classified as a "hospital admitting clerk," the vocational expert indicated this position has an SVP level of 6 (Tr. 384). This is an indication of the degree of skill required to perform the job. As Dr. Pearsall described in his vocational report submitted to the Appeals Council, this occupation actually only has an SVP level of 4, making it in reality a lower end semi-skilled occupation (Tr. 317). The defendant argues that the error is harmless because the position actually requires a lesser degree of skill than cited by the vocational expert.

---

[4]The correct number for the position of medical assistant is DOT no. 079.36**2**-010.

However, in his report submitted to the Appeal Council on the plaintiff's behalf, Dr. Pearsall indicated there would be no transferable skills to this occupation, stating:

> Certainly there are not sufficient transferable skills to transfer to a semi-skilled position with little or no adjustment, training, or retraining which would be the Social Security Administration standard referencing Ms. Morse's age of 62. The hospital admitting clerk is primarily a semi-skilled clerical position whereas the licensed practical nurse is a skilled direct care medical provider with few if any clerical duties.

(Tr. 317). Upon remand, the ALJ should instructed to obtain clarification from the vocational expert as to the transferability of the plaintiff's skills to this position.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

April 21, 2009

Greenville, South Carolina